# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2013-KA-00134-COA

**JAMES DAVID FORTENBERRY A/K/A JAMES DAVID FORTENBERRY, JR.**                    APPELLANT

**v.**

**STATE OF MISSISSIPPI**                    APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 07/23/2012 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN M. COLETTE |
| | SHERWOOD ALEXANDER COLETTE |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: LAURA HOGAN TEDDER |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| TRIAL COURT DISPOSITION: | CONVICTED OF TWO COUNTS OF SEXUAL BATTERY AND ONE COUNT OF FORCIBLE RAPE AND SENTENCED TO THREE CONCURRENT TERMS OF THIRTY YEARS ON EACH COUNT, WITH TEN YEARS SUSPENDED AND FIVE YEARS OF SUPERVISED PROBATION, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS |
| DISPOSITION: | AFFIRMED - 08/11/2015 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE IRVING, P.J., ISHEE AND CARLTON, JJ.**

**IRVING, P.J., FOR THE COURT**:

¶1.     A Rankin County jury found James David Fortenberry guilty of two counts of sexual battery and one count of rape. The Rankin County Circuit Court sentenced him to concurrent terms of thirty years on each count, with ten years suspended and five years of supervised

probation, all in the custody of the Mississippi Department of Corrections (MDOC).

¶2.    Feeling aggrieved, Fortenberry appeals and argues: (1) he was denied effective assistance of counsel; (2) he was denied a fair trial as a result of prosecutorial misconduct; (3) the circuit court erred in denying his amended motion for a new trial; (4) the circuit court erred in its instructions to the jury; (5) the State failed to disclose the existence of *Brady*[1] material; and (6) the circuit court abused its discretion in denying his motion for a new trial based on its finding that there was no *Brady* violation.

¶3.    Finding no error, we affirm Fortenberry's convictions and sentences.

FACTS

¶4.    On the night of February 15, 2011, at approximately 10 p.m., Ellis Wilkerson and his girlfriend, Catherine Branch,[2] went to the Brandon City Park, where they walked along a trail that was located toward the back of the park.[3]   The trail traversed a bridge, and while Wilkerson and Catherine were standing on the bridge, a man wearing a ski mask and holding a gun suddenly appeared in front of them.  The man gestured with his gun for the couple to get down on the ground.  Wilkerson put his hands in the air and proceeded to lie down on the ground.  According to Catherine, as she began to lie down on the ground, the man grabbed her by her hair and dragged her up a hill.  He then unzipped his pants, placed the gun to

---

[1] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

[2] We have substituted a pseudonym for the name of the sexual-assault victim to help protect her identity.

[3] It was not uncommon for them to walk in the park.

Catherine's neck, forced her to perform oral sex on him, and then disappeared.

¶5.     As Catherine recovered from the assault, a second assailant, later identified as Jeremy Holloway, Wilkerson's roommate, also donning a mask, suddenly appeared. Holloway also pointed a gun at Catherine and forced her to perform oral sex on him. He then vaginally raped her and forced her to perform oral sex on him once again.[4] After the sexual assault, Holloway told Catherine to stay on the ground and not to look at him; so, Catherine remained on the ground.

¶6.     At some point during the sexual assault by Holloway, the first perpetrator, identified himself to Wilkerson as Fortenberry.[5] After the assault by Holloway, Fortenberry and Wilkerson then went to Catherine's location. Once there, Fortenberry punched Wilkerson and instructed him to lie down next to Catherine.[6] Fortenberry then walked away.

¶7.     After lying on the ground for about thirty minutes, Wilkerson and Catherine walked to the nearby Kroger parking lot, where Wilkerson's and Catherine's cars were parked. When Catherine asked Wilkerson if they should go to the police, he told her that the assailants had informed him that they would be killed if they reported the assault. Catherine then asked Wilkerson if she could stay with him, but he refused. After Wilkerson left,

---

[4] A jury tried and convicted Holloway for the same offenses.

[5] However, Catherine did not learn of the perpetrator's identity until the next night when Wilkerson brought Fortenberry to Catherine in attempt to prevent Catherine from pressing charges.

[6] Fortenberry admitted that he faked the punch.

3

Catherine got into her car and started to drive toward her home; however, she went to the Pearl Police Department (PPD) instead and reported the assault, informing the police that she had been sexually assaulted in the park. The PPD informed the Brandon Police Department (BPD), and officers from the BPD later took Catherine to the University of Mississippi Medical Center (UMMC), where nurse Kelly Burke examined her and administered a rape kit.

¶8.     While Catherine was at UMMC, Officer David Smith went to Wilkerson's apartment to speak with him, initially believing that he too was a victim. Holloway answered the door and helped Officer Smith locate Wilkerson, who was not at the apartment at the time. Officer Smith later spoke with Wilkerson at the BPD. After speaking with Wilkerson, Officer Smith also spoke with Holloway at the station, and Holloway gave Officer Smith permission to search his cell phone. Officer Smith looked through Holloway's cell phone and noticed phone-call traffic between Holloway and Wilkerson between 10:30 p.m. and 10:45 p.m. on February 15, 2011. Information found in Holloway's cell phone also indicated that he had contacted Fortenberry during the same time period. Holloway then allowed Officer Smith to search his and Wilkerson's apartment, where Officer Smith retrieved a pistol, a holster, and a ski mask.

¶9.     At 5 a.m. the next morning, Officer Smith spoke with Catherine, who had been taken to the BPD after the completion of her examination at UMMC. Catherine informed him that one of her assailants "was tall with long hair and . . . skinny." Officer Smith then obtained

4

a search warrant for Holloway's DNA. Officer Smith then spoke with Fortenberry and asked if he had been at the park the previous night. Fortenberry originally stated that he had not been at the park and that he had been at Wilkerson and Holloway's apartment. Smith then asked Fortenberry to explain his cell-phone records, which indicated that he had been in the park area during the time the rape occurred. Fortenberry explained that he had car trouble and had to stop at a restaurant near the park to look at his car which, according to Fortenberry, explained the use of his cell phone in the area.

¶10. On February 18, 2011, Fortenberry voluntarily gave a statement, part of which is a follows:

> I talked to [Wilkerson] and found out he and [Catherine] were going to the park[,] so I decided to play a prank on the both of them. [Holloway and I] got his ski mask and plastic toy pistol[,] . . . drove up to the park[,] and snuck out there. [Wilkerson] and [Catherine] were by the bridge[,] and I walked down the hill with the gun and mask on and pointed it at [Wilkerson,] never [at Catherine]. [I] [m]ade them walk a few feet [and] lay [sic] down on their stomachs. I gave the mask and gun to [Holloway] and pulled [Wilkerson] to the side and let him know it was me. . . . I layed [sic] [Wilkerson] beside [Catherine]. . . . [Holloway] [had] already left[,] and I left. . . . I did not touch her or make her do anything in that park.

¶11. On May 20, 2011, Fortenberry, Holloway, and Wilkerson were jointly indicted for two counts of sexual battery and one count of rape. On March 8, 2012, the circuit court granted Fortenberry's motion to sever. Throughout the trial, Fortenberry maintained that although he went to the park to "prank" Catherine and Wilkerson, he did not sexually assault Catherine. The jury found Fortenberry guilty as charged. As noted, the circuit court sentenced Fortenberry to concurrent thirty-year sentences on each count, with ten years

5

suspended and five years of supervised probation, all in the custody of MDOC.

¶12. After filing his notice of appeal, Fortenberry filed a motion to stay the appeal to allow him to request that the circuit court consider evidence regarding an alleged *Brady* violation. This Court granted the motion to stay, and directed the circuit court to hold a hearing on the limited issue of whether there had been a *Brady* violation, specifically whether the State had suppressed evidence of an alleged written statement given by Chris Moore to Officer Smith that would have helped Fortenberry's defense. The circuit court held a hearing on April 29, 2014, and ultimately found that there was no *Brady* violation. This appeal followed.

## DISCUSSION

### I.     *Ineffective Assistance of Counsel*

¶13. Fortenberry first argues that he received ineffective assistance of counsel. In *Aguilar v. State*, 847 So. 2d 871, 878 (¶17) (Miss. Ct. App. 2002) (internal citations omitted), we explained:

> It is unusual for this Court to consider a claim of ineffective assistance of counsel when the claim is made on direct appeal. . . . This Court will rule on the merits on the rare occasions where (1) the record affirmatively shows ineffectiveness of constitutional dimensions, or (2) the parties stipulate that the record is adequate to allow the appellate court to make the finding without consideration of the findings of fact of the trial judge.

After a thorough review of the record, we cannot find that it affirmatively shows ineffectiveness of constitutional dimensions. Consequently, we deny relief on this issue without prejudice. Fortenberry may, if he desires to do so, raise this claim in a motion for post-conviction relief.

6

## II. Prosecutorial Misconduct

¶14. Fortenberry argues that the prosecutor engaged in several instances of prosecutorial misconduct, resulting in reversible error. Specifically, he takes issue with various statements made by the State during its opening statements and closing arguments.

¶15. During its opening statements, the State informed the jury that following the sexual assault and rape, Wilkerson refused to take Catherine to the police. The State also informed the jury that in an attempt to prevent "his buddies [from getting] in trouble[,]" Wilkerson tried to convince Catherine that the assailants would kill them if they sought the help of authorities. The following colloquy occurred during Catherine's direct testiomony:

> Q: Did you and [Wilkerson] go to the [BPD] that was right there?
>
> A: No ma'am.
>
> Q: Why not?
>
> A: [Wilkerson] told me that they threatened him to—that they were going to kill him if we did go to the police.
>
> Q: Okay. And so where did you go?
>
> A: I went to the Kroger parking lot[,] and I drove home. Well, I planned on driving home.

¶16. During its closing arguments, the State again referenced the fact that Wilkerson told Catherine not to go to the police. On appeal, Fortenberry argues that the statements made and adduced by the State were improper because Wilkerson could not be questioned. Therefore, according to Fortenberry, allowing testimony and argument regarding what

7

Wilkerson told Catherine violated his Sixth Amendment right to confront his accusers. Fortenberry also argues that statements regarding the conversation between him and the assailants were hearsay. We note, however, that Fortenberry did not make a contemporaneous objection at the time the testimony was elicited from Catherine, and no objection was made during closing arguments. Since Fortenberry did not make a contemporaneous objection, "any error is waived." *Rubenstein v. State*, 941 So. 2d 735, 751 (¶33) (Miss. 2006) (citing *Moawad v. State*, 531 So. 2d 632, 634 (Miss. 1988)).

¶17. Fortenberry further argues that the prosecutor committed misconduct by referring to him as a liar. During closing arguments, the prosecutor said, "You have to believe that Catherine[,] . . . [who as] the Defendant [testified] . . . tells the truth on every single thing[,] [has lied] about this; and that [Fortenberry,] who will lie to get out of trouble, and has done so multiple times[,]" is telling the truth. Fortenberry claims this statement was highly prejudicial to his case.

¶18. The standard of review this Court applies to allegations of prosecutorial misconduct during opening statements or closing arguments is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Slaughter v. State*, 815 So. 2d 1122, 1130 (¶45) (Miss. 2002) (citation omitted). In addition, "[a]ny alleged[ly] improper prosecutorial comment must be considered in context, considering the circumstances of the case . . . ." *Ahmad v. State*, 603 So. 2d 843, 846 (Miss. 1992). "Counsel is allowed considerable latitude

8

in the argument of cases." *Ivy v. State*, 589 So. 2d 1263, 1266 (Miss. 1991) (citing *Craft v. State*, 271 So. 2d 735, 737 (Miss. 1973)). He is not limited to the facts introduced into evidence, but he may argue the deductions and conclusions that may reasonably be drawn therefrom. *See Ivy*, 589 So. 2d at 1266.

¶19. Here, the State highlighted Fortenberry's inconsistent statements, specifically referring to the fact that Fortenberry initially stated that he was not at the park, then later stated he was in the area, and then later yet made a written statement that it was his idea to play a "prank" and that he was at the park. In *Dora v. State*, 986 So. 2d 917, 923-24 (¶¶11-14) (Miss. 2008), a case cited by the State, the Mississippi Supreme Court opined that the State is allowed to comment on the weaknesses in a defendant's case. Since the State was simply pointing out the inconsistences in Fortenberry's stories, we cannot find that the State committed prosecutorial misconduct or that it created an unjust prejudice against Fortenberry, resulting in a decision influenced by that prejudice.

¶20. Further, Fortenberry submits that the State led the jury to believe that DNA evidence linked him to the offenses charged. During its closing argument, the State said, "Ladies and gentleman, in this case Catherine did everything we want a rape victim to do. . . . She went to the police. She reported it. She went to the hospital. She had a rape kit performed. ***And lo[] and behold, we have DNA***. We know she was sexually assaulted." (Emphasis added). Again, Fortenberry argues that this statement was highly prejudicial. Here, the State outlined the events that transpired—one of which was the fact that DNA was recovered. The State

9

did not insinuate that the DNA was Fortenberry's. In fact, during its opening statements, the State said Holloway's—not Fortenberry's—DNA was obtained from the vaginal swab. The transcript reveals that during the trial, two separate experts confirmed that only Holloway's DNA was found on Catherine's vaginal swab. Viewed in context, and taking the circumstances of the case into consideration, we find Fortenberry's argument of prejudicial prosecutorial misconduct is without merit.

¶21. Finally, Fortenberry argues that even if these individual errors of prosecutorial misconduct do not amount to reversible error, the cumulative effect warrants reversal. We acknowledge that our supreme court has held that the cumulative effect of errors in the circuit court may warrant reversal even when the instances taken separately do not. *See Jenkins v. State*, 607 So. 2d 1171, 1183 (Miss. 1992); *Griffin v. State*, 557 So. 2d 542, 553 (Miss. 1990); *Stringer v. State*, 500 So. 2d 928, 939 (Miss. 1986); *Hickson v. State*, 472 So. 2d 379, 385-86 (Miss. 1985). As noted, we find no separate instances of prosecutorial misconduct. Therefore, there can be no cumulative error. This issue is without merit.

### III. *Motion for a New Trial*

¶22. Fortenberry argues that the circuit court erred in denying his amended motion for a new trial. The core of Fortenberry's argument is that the State's evidence consisted of only the victim's at-times-controversial version of what happened, aided by the erroneous admission of hearsay evidence and leading questions by the State. He points out that his DNA was not found on the victim.

¶23. In our review of a denial of a motion for a new trial, we accept as true all evidence in favor of the State. *Price v. State*, 892 So. 2d 294, 297 (¶11) (Miss. Ct. App. 2004) (citing *White v. State*, 761 So. 2d 221, 224 (¶12) (Miss. Ct. App. 2000)). We will reverse the denial of a motion for a new trial only if the circuit court abused its discretion. *Id.* Additionally, our supreme court has opined that an appellate court "will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bush v. State*, 895 So. 2d 836, 844 (¶18) (Miss. 2005) (citation omitted).

¶24. Fortenberry's argument goes to the credibility of the evidence, and our law is well settled that the jury decides the credibility of the witnesses and the evidence. *See McKay v. State*, 59 So. 3d 644, 646 (¶6) (Miss. Ct. App. 2011). Here, the jury chose to believe Catherine, the victim. Based on the totality of the evidence, we cannot say that allowing the verdict to stand will sanction an unconscionable injustice.

*IV. Jury Instructions*

¶25. Fortenberry argues that the circuit court erred in giving certain jury instructions. "When reviewing jury instructions on appeal, the jury instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context." *Wood v. Conley*, 78 So. 3d 920, 926 (¶12) (Miss. Ct. App. 2011) (internal citations and quotation marks omitted) (quoting *Burr v. Miss. Baptist Med. Ctr.*, 909 So. 2d 721, 726 (¶12) (Miss. 2005)).

> A defendant is entitled to have jury instructions given which present his theory
> of the case[;] however, this entitlement is limited in that the court may refuse

11

an instruction which incorrectly states the law, is covered fairly elsewhere in the instructions, or is without foundation in the evidence.

*Phillipson v. State,* 943 So. 2d 670, 671 (¶6) (Miss. 2006).

¶26.    Fortenberry argues that he was entitled to have the jury instructed that before it could find him guilty of the sexual battery and forcible rape of Catherine, it must find that he *"intended to aid and abet . . .* Holloway in such sexual penetration of Catherine; and *did aid and abet . . .* Holloway in such forcible sexual intercourse." Making the same argument in the circuit court, Fortenberry requested the following instruction that was refused:

INSTRUCTION D-2b

The Court instructs the Jury that if you unanimously find from the evidence in this case that the State has proven beyond a reasonable doubt that:

1.    JEREMY WADE HOLLOWAY, on or about the 15th day of February, 2011, in Rankin County, Mississippi;

2.    Engaged in sexual penetration with [C.B.] by inserting his penis in her mouth;

3.    Without her consent;

4.    And that JAMES DAVID FORTENBERRY specifically intended to aid and abet Jeremy Wade Holloway in such sexual penetration of [C.B.]; and

5.    Did aid and abet Jeremy Wade Holloway in such forcible sexual intercourse.

Then you shall find JAMES DAVID FORTENBERRY[] guilty of Sexual Battery in Count II.

If the State has failed to prove each and every element of the crime of Sexual Battery in Count II, then you shall find JAMES DAVID FORTENBERRY not

12

guilty of Sexual Battery in Count II.

¶27. In refusing Instruction D-2b, the circuit court noted that it had given the following instruction requested by the State, which covered the same subject matter:

INSTRUCTION S-4

The Court instructs the Jury that if you unanimously find from the evidence in this case, beyond a reasonable doubt, that the defendant, James David Fortenberry, individually or while aiding and abetting or while acting alone or in concert with another, on or about February 15, 2011, in Rankin County, Mississippi, did:

1.  Willfully, unlawfully and intentionally;

2.  Engage in sexual penetration with Catherine Branch, a female human being;

3.  By Jeremy Holloway inserting his penis in Catherine Branch's mouth;

4.  Without her consent;

then in that event, the defendant, James David Fortenberry, is guilty of sexual battery in Count 2 and it is your sworn duty to so find.

The Court further instructs the jury that if the State fails to prove any of the above elements beyond a reasonable doubt, then in that event you must find the defendant, James David Fortenberry, not guilty as to Count 2.

¶28. Fortenberry also argues that he was entitled to the following instruction, which was also refused by the circuit court:

INSTRUCTION D-5

The Court instructs the Jury that the guilt of the defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything

13

a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a specific crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find James David Fortenberry guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that James David Fortenberry voluntarily participated in its commission with the intent to violate the law.

¶29. In refusing to give Instruction D-5, the circuit court noted that it had given the following instruction requested by the State, which covered the same subject matter:

INSTRUCTION S-1

The Court instructs the Jury that the guilt of the defendant in a criminal case may be established without proof that the defendant personally did every act constituting the offense alleged. The law recognizes that, ordinarily, anything a person can do for himself may also be accomplished by that person through the direction of another person as his or her agent, by acting in concert with, or under the direction of, another person or persons in a joint effort or enterprise.

14

If another person is acting under the direction of the defendant or if the defendant joins another person and performs acts with the intent to commit a crime, then the law holds the defendant responsible for the acts and conduct of such other persons just as though the defendant had committed the acts or engaged in such conduct.

Before any defendant may be held criminally responsible for the acts of others it is necessary that the accused deliberately associate himself in some way with the crime and participate in it with the intent to bring about the crime.

Of course, mere presence at the scene of a crime and knowledge that a crime is being committed are not sufficient to establish that a defendant either directed or aided and abetted the crime unless you find beyond a reasonable doubt that the defendant was a participant and not merely a knowing spectator.

In other words, you may not find James David Fortenberry guilty unless you find beyond a reasonable doubt that every element of the offense as defined in these instructions was committed by some person or persons, and that James David Fortenberry voluntarily participated in its commission with the intent to violate the law.

¶30. First, we note that Fortenberry offers no authority for his apparent contention that Instruction S-4 did not adequately instruct the jury on the law of aiding and abetting, thereby creating the need for the additional instruction that he offered. Therefore, we are not required to consider his argument. *See Howard v. State*, 945 So. 2d 326, 356 (¶62) (Miss. 2006).

¶31. Nevertheless, we briefly consider whether the jury was properly instructed. Instruction S-4 and Instruction D-2b both instruct on the law of aiding and abetting another in the commission of a crime. However, Instruction S-4, in conjunction with Instruction S-1, adequately informed the jury that it could not find Fortenberry guilty of the crimes committed by Holloway unless it found that Fortenberry deliberately associated himself in some way

15

with the crimes and participated in them with the intent to bring about the crimes. In other words, the State was not required to identify the specific act of participation by Fortenberry, just that he participated in some way to bring the crime into fruition. Further, we have explained:

> A defendant must show that his requested instruction was (1) a correct statement of the law, (2) not substantially covered in the jury charges as a whole, and (3) of such importance that the court's failure to instruct the jury on that issue seriously impaired the defendant's ability to present his given defense.

*Ross v. State*, 22 So. 3d 400, 424 (¶117) (Miss. Ct. App. 2009) (citation and quotations omitted). "If the instructions fairly state the law of the case and no injustice is created, no reversible error will be found." *Id*. at 423 (¶115). Here, after reviewing the instructions requested by Fortenberry, we find that he failed to meet all of the requirements for his requested instructions to be given. Furthermore, we find that the instructions that the circuit court gave fairly stated the law of the case, and, as such, this argument is without merit.

        V.      *Brady Violation*

¶32.    Fortenberry also asserts that the State withheld an exculpatory statement made by Chris Moore, who lived near Fortenberry and Wilkerson. Fortenberry claims that Chris overheard Catherine recant her story, specifically stating that "it didn't happen." In *Brady*, 373 U.S. at 87, the United States Supreme Court established the principle that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith

16

or bad faith of the prosecution." Our supreme court has held:

> To establish a *Brady* violation[,] a defendant must prove the following: (1) that the government possessed evidence favorable to the defendant (including impeachment evidence); (2) that the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

*King v. State*, 656 So. 2d 1168, 1174 (Miss. 1995) (citing *United States v. Spagnoulo*, 960 F.2d 990, 994 (11th Cir.1992)).

¶33.    At the *Brady* hearing, Officer Smith stated that, while he recalled speaking with Chris and noted the conversation in his investigative report, he did not recall or report Chris stating that he heard Catherine had recanted her story. Furthermore, Officer Smith testified that he did not have a written statement because Chris did not give him one. Officer Smith explained that he did not do a write up of the discussion because "he did not think the information [Chris] provided was helpful to the investigation."

¶34.    At the *Brady* hearing that was ordered by this Court, Fortenberry submitted an affidavit dated June 7, 2013, from Chris, detailing his alleged conversation with Officer Smith that occurred on or about February 17, 2011.[7] In the affidavit, Chris swore that he gave Officer Smith a written statement advising Officer Smith that he had heard Catherine and Wilkerson arguing in the hallway outside their apartment and that he specifically heard

---

[7] We note that no affidavit was attached to Fortenberry's motion for a new trial, which was filed on November 9, 2012.

Catherine tell Wilkerson that she was going to drop the charges because "this didn't happen." We note that in Chris's affidavit he recalled that his wife, Lauren, was present, saw him write out the statement, and witnessed it. However, at the *Brady* hearing, Chris could not recall whether his wife witnessed the statement that he gave to Officer Smith, and when his wife was questioned, she could not recall witnessing or signing a "sheet of paper." She also could not recall the content of the purported written statement.

¶35. The circuit court ultimately held that the credibility of Officer Smith's testimony outweighed Chris's testimony. The circuit court pointed to the contemporaneous nature of Officer Smith's notes versus Chris's affidavit made more than two years after the events transpired to which, substantively, his wife could not attest. The circuit court found that the State did not possess a written statement by Chris. Furthermore, the circuit court found that Fortenberry himself, by the utilization of reasonable diligence, could have obtained whatever information Chris gave to Officer Smith because Chris and his wife were listed as potential witnesses in Officer Smith's report. Finally, the circuit court held that even if Chris had testified during the trial about what he had allegedly overheard, there was no reasonable probability that the outcome of the trial would have been different.

¶36. Fortenberry cites *Manning v. State*,158 So. 3d 302 (Miss. 2015) as support for his argument. In *Manning*, Willie Manning, the defendant, was found guilty of murdering two elderly women in an apartment complex in Starkville, Mississippi. *Id.* at 304 (¶1). A witness testified that he saw the defendant enter the women's apartment shortly before the bodies

18

were discovered. *Id.* At some point, it was discovered that the Starkville Police Department had conducted a canvas of the apartment complex, and index cards were created, stored, and maintained at the police department. *Id.* at 305 (¶6). "An entry on the cards reveal[ed] that the apartment from which [the witness] testified he observed Manning enter the victims' apartment was vacant at the time of the crime, and neither [the witness] nor his girlfriend . . . was listed as a resident of any of the apartments canvassed." *Id*.

¶37. Manning was convicted and sentenced to death. His conviction and sentence were upheld by the supreme court. *See Manning v. State*, 735 So. 2d 323 (Miss. 1999). Years later, Manning filed a motion for post-conviction relief, which was denied by the circuit court. *Manning*, 158 So. 3d at 304 (¶2). On appeal, the supreme court reversed, finding that a *Brady* violation had occurred and "the State violated Manning's due-process rights by failing to provide favorable, material evidence." *Id.* at 307 (¶14).

¶38. *Manning* is not on point for several reasons. First, in *Manning* there was uncontroverted testimony that the index cards existed and were not provided to Manning. Here, on the other hand, the circuit court found that Chris did not give Officer Smith a written statement. Second, in *Manning*, the defendant did not have the ability to discover the helpful information himself, as re-canvassing the apartment building after three and a half years "defie[d] computation of even a minimal degree of success." *Id.* at 306 (¶10). But here, as the circuit court found, Fortenberry could have learned of the allegedly helpful information himself, because Chris and his wife were listed as witnesses in Officer Smith's

19

report, and Fortenberry could have easily interviewed them. There is no claim that Fortenberry did not have access to Officer Smith's report.

¶39. We find that the circuit court did not err in finding that no *Brady* violation occurred, as Fortenberry failed to meet the first two prongs of *Brady*—that the State possessed evidence favorable to him and that he could not obtain the evidence himself by utilizing reasonable diligence. Therefore, this issue is without merit. In light of our finding that the circuit court did not err in finding that a *Brady* violation did not occur, the denial of the motion for a new trial is also without error.

¶40. **THE JUDGMENT OF THE CIRCUIT COURT OF RANKIN COUNTY OF CONVICTION OF TWO COUNTS OF SEXUAL BATTERY AND ONE COUNT OF FORCIBLE RAPE AND SENTENCE OF THREE CONCURRENT TERMS OF THIRTY YEARS, WITH TEN YEARS SUSPENDED AND FIVE YEARS OF SUPERVISED PROBATION, ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.**

**LEE, C.J., GRIFFIS, P.J., BARNES, ISHEE, CARLTON, MAXWELL, FAIR AND JAMES, JJ., CONCUR. WILSON, J., NOT PARTICIPATING.**