# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2018-KA-00681-COA

**ANGELIA BYRD A/K/A ANGELINA BYRD**         **APPELLANT**
**A/K/A ANGELIA MARIE BYRD**

**v.**

**STATE OF MISSISSIPPI**         **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 03/29/2018 |
| TRIAL JUDGE: | HON. WINSTON L. KIDD |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT, FIRST JUDICIAL DISTRICT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: GEORGE T. HOLMES |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: LISA L. BLOUNT |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 06/11/2019 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE J. WILSON, P.J., WESTBROOKS AND McDONALD, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1. The Hinds County Circuit Court convicted Angelia Byrd on the charge of murder and then denied her post-trial motion. She appeals. Finding no error, we affirm.

## FACTS

¶2. On April 8, 2014, Angelia Byrd shot and killed her live-in boyfriend, Aaron Harper. Byrd did not testify at her trial, so her version of the facts is drawn from the testimonies of law enforcement officers and other witnesses with whom she had spoken.[1]

---

[1] Although Byrd was interviewed by law enforcement, no written statement or recorded oral statement was entered into evidence.

¶3.     Byrd, a fifty-year-old nurse, and Harper, a thirty-three-year-old security guard, had lived together for a little over a year in Byrd's home in Jackson.  Byrd paid all the living expenses and provided vehicles for both herself and Harper.  But the relationship was waning.  Harper had threatened her and her family on occasion, and Byrd had written Harper a four-page letter saying that she thought they should separate.

¶4.     On the evening in question, Byrd came home from work and grilled steaks for dinner. Byrd had either left the four-page letter out, intending for Harper to see it later, or she gave it to him and asked him to read it later.  But he opened it, read it, became angry, and started yelling.[2]  Byrd slapped the letter out of his hands,[3] threw down a beer bottle she was holding, and told him to leave.  At some point, Byrd said that Harper grabbed her but she had no bruises or scratches on her.  Byrd also said that Harper picked up a steak knife and said he was going to get his gun.  Byrd said she was afraid he would shoot her, so she got her gun, a .38-caliber revolver.  Before Harper took any further action, Byrd shot him.

¶5.     During the final moments of this confrontation, Byrd had called her sister, Cynthia Thornton.  Thornton testified that she was on the phone with Byrd and heard Byrd and Harper arguing.  She did not hear any shots but she did hear Harper say, "I don't believe you just did that," and then Byrd told Thornton that she had shot Harper.  Thornton instructed Byrd to call an ambulance and the police.

---

[2] Byrd told another detective that she and Harper had argued over a tow truck Harper wanted her to buy for him.

[3] Somehow the letter ended up on the grill in the backyard when it was found by police after Byrd told them to turn off the grill before they left.

¶6. After calling the police, Byrd went outside, taking the gun and spent cartridges with her. When the police arrived, she calmly, without emotion, voluntarily surrendered and told them that she had shot Harper.

¶7. Inside the home, police found bullet holes in the living room wall and blood on the floor along with a broken bottle. They also found a pink holster. In the bedroom where Harper was on the floor behind the door, they found Harper's duty-belt but no gun in the holster. Police found no gun in the home, but they did not search the vehicles outside.

¶8. Byrd was taken into custody, and Harper's body was taken for an autopsy. The autopsy report showed that Harper had gunshot wounds to the right abdomen, left chest, right back, and right side. Two wounds were perforating, meaning that the bullets created entry and exit wounds. Three of these wounds were fatal.

¶9. During her interrogation Byrd told one investigator that Harper had also threatened to report her to the nursing board for violating HIPAA laws.[4]

¶10. After her arrest, Byrd's adult son, Shane Byrd, posted her bond. At that time Byrd told him she shot Harper in self defense. But after her indictment, while awaiting her trial, Byrd later told her son that Harper had asked her to stop shooting him for the sake of his child. Despite this plea, Byrd told her son that she shot Harper again. Shane also told law enforcement that his mother had shot his father (her ex-husband) in the past.

¶11. Byrd was indicted on July 22, 2014, for murder by "shooting Aaron Harper two times in the stomach, one time in the chest, one time in the left side and one time in the back. . . ."

---

[4] "HIPAA" refers to the Health Insurance Portability and Accountability Act.

After a number of continuances, the case was tried in March 2018. Byrd was convicted and sentenced to life in prison. Her motion for a new trial was denied.

¶12. On appeal, Byrd raises three issues: (1) whether her trial was unfair due the entry of evidence of other bad acts; (2) whether her trial was unfair due to prosecutorial misconduct; and (3) whether her trial attorney provided ineffective assistance by failing to request a Castle Doctrine instruction.

**STANDARD OF REVIEW**

¶13. The appellate court reviews the admission of evidence under the abuse-of-discretion standard and evidentiary rulings are affirmed unless they affect a substantial right of the complaining party. *Boggs v. State*, 188 So. 3d 515, 519 (¶9) (Miss. 2016). The standard of review this Court applies to allegations of prosecutorial misconduct during opening statements or closing arguments is "whether the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Fortenberry v. State*, 191 So. 3d 1245, 1251 (¶18) (Miss. Ct. App. 2015). *Hannah v. State*, 943 So. 2d 20 (Miss. 2006), sets out the standard for evaluating claims of ineffective assistance of counsel as set out in *Strickland v. Washington*, 466 U.S. 668 (1984): (1) "the convicted defendant must show that counsel's representation fell below an objective standard of reasonableness," and (2) "the defendant must show there is reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different." *Hannah*, 943 So. 2d at 24 (¶6).

**DISCUSSION**

4

**I. Whether Byrd was denied a fair trial because of inconsistent court rulings that allowed the jury to hear evidence of other bad acts.**

¶14. When interviewed by the police after the shooting, Byrd said that Harper had threatened to go to the hospital or nursing board to report her for HIPAA violations. Before trial, the defense had informed the court that seven years earlier, Byrd had a problem with drugs and had an encounter with the nursing board then. There was mutual agreement with the court's approval that this old problem would not be raised at trial. But the circuit court was not apprised before trial about Harper's more recent threat to report Byrd to her employer and that this may have been at least one of the reasons for the argument that resulted in the shooting. This issue came up in trial during questioning of the investigating officers. The State called Detective Daryl Owens and asked him:

> Q.     Okay. Now also during the course of your interview, Ms. Byrd told you that Aaron Harper was threatening to go to the nursing board on her; is that right?
>
> MR. KNOTT: Objection, Your Honor. First of all, it's beyond the scope.
>
> THE COURT: All right. That's sustained.
>
> MS. HARRIS: Judge, may we approach[?]
>
> THE COURT: You can.
>
> **(BENCH CONFERENCE)**
>
> Q. (By Ms. Harris)  Detective Owens, did Ms. Byrd tell you that Aaron was threatening to go to the nursing board and tell the nursing board that she had violated – the [HIPAA] violation?
>
> A.     Correct.
>
> MR. KNOTT: Again, objection, Your Honor, for the record.

5

THE COURT: It's overruled.

This ruling made it appear that the court was allowing the testimony of Harper's threats.

¶15.    But the court made the opposite ruling shortly thereafter during the questioning of Detective Vergil Jarman:

> Q.    I'm sorry. Did Ms. Byrd ever say that she had to call law enforcement prior to this evening?
>
> A.    Not that I recall.
>
> Q.    Okay.
>
> A.    I know she said at one point because he did verbally threaten her what she said about her job because –
>
> MR. KNOTT: Your Honor, object. There is no question before this witness.
>
> THE COURT: Sustained.

¶16.    The State pressed the issue one more time with another series of questions to Detective Jarman:

> Q. (By Ms. Perry)    You mentioned that in your interview with Ms. Byrd that she made a reference to a threat by Aaron Harper. Can you tell us about that?
>
> A.    She said that Aaron Harper had made a threat to her with her job, and the threat was that –
>
> MR. KNOTT: Your Honor, I object.
>
> THE COURT: Sustained.

The jury was excused, and the parties conferred with the court. The court asked specifically what Byrd had said to Detective Jarman, and the State replied that Byrd had said that Harper was threatening to go to the hospital to say that she had discussed patients with him in

violation of HIPAA laws. The state argued that this information was relevant because it was the reason why they were arguing. After the defense responded, the court said: "At this point, we're going to exclude that particular testimony."

¶17. Unfortunately, later, on cross-examination by defense counsel, Jarman again testified (without objection): "I know that she was upset about him threatening to call her work. I know she was upset about that."

¶18. In closing, the State argued this threat to the jury, saying: "She killed him, without excuse, without justification. She made up her mind that he would no longer threaten her job. She made up her mind that she had to keep him quiet." Although the defense's objection was sustained, the State continued, "She made up in her mind that she was going to silence him on that day on April 8th, 2014[,] . . . and silence him she did."

¶19. It is clear that the jury heard testimony of Harper's threats to report Byrd for some work-related misconduct although the circuit court tried to exclude it. Byrd now argues that the jury was "confused" by the circuit court's inconsistent rulings on this matter so much so that Byrd's right to a fair trial was compromised by the admission of an alleged "bad act" in Byrd's employment.

¶20. According to Mississippi Rule of Evidence 404(a) evidence of a prior crime, wrong, or act is not admissible to show that on a particular occasion a person acted in accordance with their character. But Rule 404(b) says it may be admissible if offered for a different purpose:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith.

7

It may, however, be admissible for other purposes such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

¶21. Evidence of other acts can be admissible if the prosecutor clearly articulates the alternative purpose for the evidence and shows that the Rule 404(b) exception is a material issue in the case. *Strickland v. State*, 220 So. 3d 1027, 1032-33 (¶¶16-20) (Miss. Ct. App. 2016). But the probative value of such evidence must not be substantially outweighed by the prejudicial effect. M.R.E. 403; *Leedom v. State*, 796 So. 2d 1010, 1015 (¶15) (Miss. 2001). If such evidence has been admitted under Rule 404(b), the trial court must give an instruction to the jury explaining the limited purposes for which that evidence may be considered, *Derouen v. State*, 994 So. 2d. 748, 756 (¶20) (Miss. 2008).

¶22. Evidence to prove motive or state of mind is an exception to Rule 404(b). In *Newell v. State*, 175 So. 3d 1260, 1275 (¶33) (Miss. 2015), the Mississippi Supreme Court held that the trial court did not abuse its discretion in admitting defendant's threatening voice mail to his wife, because it was admitted as proof of motive and intent behind his altercation with his shooting victim. The *Newell* court stated:

> Evidence of prior bad acts is admissible if the offense being tried and the prior act are "so interrelated as to constitute a single transaction or occurrence or a closely related series of transactions or occurrences." *Neal v. State*, 451 So. 2d 743, 759 (Miss.1984). "[W]hen dealing with closely related acts, the State 'has a legitimate interest in telling a rational and coherent story of what happened.'" *Welde v. State*, 3 So. 3d 113, 117 (Miss. 2009) (quoting *Brown v. State*, 483 So. 2d 328, 329 (Miss.1986)). In this case, Newell's voice mail was not admitted as evidence of his character for violence. Rather, it was presented to describe to the jury why Newell was at the Slab House on the night of the incident, and it explained the motive and intent behind his altercation with Boyette. Accordingly, the trial court did not abuse its discretion in admitting Newell's voice mail.

*Newell*, 175 So. 3d at 1276 (¶34).

¶23. Here, by Byrd's own admission to law enforcement, during the altercation Harper threatened to report her to her employer. This testimony was relevant to show Byrd's motive and intent to kill Harper and thus was admissible.

¶24. Moreover, the testimony also tends to show who was the aggressor in the shooting. In *Graves v. State*, 45 So. 3d 283, 289 (¶27) (Miss. Ct. App. 2010), we affirmed the admission of testimony that would tend to prove who might be the initial aggressor in a situation. There the defense sought to introduce evidence that the victim, A.C., was angry at Graves for Graves's failure to deposit money in A.C.'s prison account during A.C.'s incarceration which ended a month before the shooting. *Id*. at 288 (¶20). We found that this evidence supported Graves's theory that A.C. was the aggressor in their later confrontation and Graves had a reasonable apprehension of harm. *Id*. at 289 (¶24). Similarly, here the testimony of Harper's threat contributes to proving that Byrd aggressively and intentionally shot Harper.

**II. Whether Byrd was denied a fair trial because of prosecutorial misconduct.**

¶25. Besides raising the prosecutor's continued press to get Harper's threat to report Byrd to her employer into evidence, Byrd argues other prosecutorial misconduct denied her a fair trial as well. Specifically, Byrd raises the prosecutor's reference to her as a "killer cougar." This image was first planted in jurors' minds in the prosecutor's opening statement when she said:

> She [Byrd] was 17 years older than Aaron, and in today's society she would

9

be considered a cougar. She and Aaron had lived together for more than a year, approximately 13 months at 5979 Libby Lane. She had bought the white Charger for Aaron and a black one for herself. She showered her man with gifts, with trips, with sex and with fun.

The prosecutor began her closing rebuttal, saying:

Thank you, Your Honor. I don't care what kind of spend [spin] you put on it. I don't care how much Crisco you use, I don't care how much stuff you throw [at] the wall and pray that it sticks. Truth of the matter is, that killer cougar sitting over there . . . That killer cougar, she killed Aaron Harper. . . . That killer cougar sitting over there killed Aaron Harper on April 8, 2014. She didn't have any excuse, no justification. Let me tell you what happened. . . .[5]

The prosecutor then coupled this image with the bad acts testimony of Byrd's shooting her ex-husband.[6]

I submit to you Aaron was about to leave that cougar. . . .

On May 28th, 2014, Mya Angelo died. Mya as a very wise woman, always has been in my eyes. And Mya said when a person shows you who they are, believe them the first time. This isn't her first time shooting at one of her men. . . . This is the second . . . This time she actually got him . . . Angelia Byrd has a history of violence toward her lovers.

And now the defense's excuse for a description of Aaron Harper being controlling, I would submit to you all of the evidence that came from this witness box indicates the cougar was the controller. She handled the business. She was in charge of everything. Now she somehow wants to avoid prosecution. She doesn't want to be prosecuted. She can't be treated any other way other than how everybody is treated. The law applies to her too. She's no different just because she's a nurse. It doesn't matter. She killed him, without excuse, without justification. She made up her mind that he would no longer threaten her job. She made up her mind that she had to keep him quiet . . . . She made up in her mind that she was going to silence him on

---

[5] The defense objected that these statements were argumentative, but the court overrule the objection.

[6] The defense did not object to Shane Byrd's testimony about Byrd shooting his father.

10

that day on April 8th, 2014. And she did silence him. She silenced him by putting four gunshots into his body. . . .

¶26. In considering challenges to a prosecutor's remarks, we have normally given prosecutors broad latitude in closing arguments; however, the ultimate question for this Court to decide is whether the prosecutor's remarks denied the defendant a fundamentally fair trial. *Stringer v. State*, 500 So. 2d 928, 939 (Miss.1986). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." *Manning v. State*, 735 So. 2d 323, 345 (¶50) (Miss.1999); *Greer v. Miller*, 483 U.S. 756, 765 (1987). Said another way, even if the comment was improper, the test used to determine if reversal is required is "whether the natural and probable effect of the prosecuting attorney's improper argument created unjust prejudice against the accused resulting in a decision influenced by prejudice." *Fortenberry v. State*, 191 So. 3d 1245, 1251 (¶18) (Miss. Ct. App. 2015); *Rushing v. State*, 711 So. 2d 450, 455 (¶15) (Miss. 1996). Furthermore, the prosecutor's statements are "reviewed to see the magnitude of prejudice, the effectiveness of the curative instruction, and the strength of the evidence of the defendant's guilt." *Holland v. State*, 705 So. 2d 307, 347 (Miss.1997).

¶27. During closing argument, the prosecutor is not limited to the facts introduced into evidence; he may argue the deductions and conclusions that may reasonably be drawn therefrom. *Donaldson v. State*, 262 So. 3d 1135 (¶128) (Miss. Ct. App. 2018). Here, the defendant failed to object to the prosecutor's characterization of Byrd during opening statement or about the fact that Byrd shot her ex-husband. Although the failure to object contemporaneously generally waives a claim of prosecutorial misconduct during closing

11

argument, we may still review such a claim if the prosecutor's statement was so inflammatory that the trial judge should have objected on his own motion. *Id*. at 1166 (¶131). In this case, we do not find that the prosecutor's statements rose to this level.

¶28. Moreover, reversal is not required when a jury is properly instructed that statements made by counsel are not evidence. *Burns v. State*, 729 So. 2d 203, 229 (¶130) (Miss. 1998). Here, the jury was so instructed and the jury is presumed to have followed the directions of the trial judge. *Catchings v. State*, 39 So. 3d 943, 949 (¶22) (Miss. Ct. App. 2009).

¶29. This Court has never held that a criminal defendant is entitled to a perfect trial. A perfect trial is simply impossible. A criminal defendant is entitled, however, to a constitutionally fair trial under the Mississippi and United States Constitutions. *Walker v. State*, 913 So. 2d 198, 250 (¶209) (Miss. 2005). A prosecutor should be careful not to indulge in personal abuse or vilification of the defendant and should not appeal to passion and prejudice. *Turner v.* State, 721 So. 2d 642, 645 (¶6) (Miss. 1998); *Curry v. State*, 328 So. 2d 328, 330 (Miss. 1976). Although we find no reversible error, we believe the prosecutor's characterization of Byrd as a "killer cougar" who was acting in conformity with her nature to shoot ex-lovers comes dangerously close to stepping over the line drawn in *Turner.* We caution those in the Bar to rein in their zealous representation of their clients in the future to avoid crossing that line.

### III. Whether Byrd's counsel was ineffective for failing to request a Castle Doctrine jury instruction.

¶30. A criminal defendant has a constitutional right to effective counsel. *Giles v. State*, 187 So. 3d 116, 120 (¶12) (Miss. 2016). To demonstrate an ineffective assistance of counsel

12

claim, a defendant must prove his counsel's performance was deficient, and that the deficiency was so substantial as to deprive the defendant of a fair trial. *Woods v. State*, 242 So. 3d 47, 55 (¶30) (Miss. 2018), *reh'g denied* (May 17, 2018). There is a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance and that the challenged action might be considered sound trial strategy. *Id.*; *Giles*, 187 So.3d at 120 (¶12). The Court considers "the totality of the circumstances" to determine whether counsel's efforts were both deficient and prejudicial. If the Court determines that the defendant did not receive reasonably effective assistance of counsel, it must then determine whether the deficiency had a "reasonable probability" of affecting the outcome of the case. *Giles*, 187 So. 3d at 120-21 (¶13). A "reasonable probability" is a probability sufficient to undermine confidence in the outcome." *Woods*, 242 So. 3d at 55 (¶30).

¶31. Byrd complains that her attorney was ineffective for failing to request a Castle Doctrine jury instruction. When claiming ineffective assistance of trial counsel because of jury instructions, it is the duty of the appellant to demonstrate both error in failing to receive the instruction and the prejudice to the defense. *Havard v. State*, 928 So. 2d 771, 789 (¶28) (Miss. 2006). In *Smiley v. State*, 815 So. 2d 1140, 1148 (¶¶30-33) (Miss. 2002), the supreme court held that the trial counsel's decision not to request a jury instruction regarding the defendant's right not to testify did not amount to ineffective assistance. The Court said it was "conceivable that [trial counsel] withdrew the jury instruction as part of his trial strategy in the hope of not highlighting [the defendant's] decision not to testify." *Id*. at 1148 (¶33). The Court noted that whatever reason trial counsel had for withdrawing the instruction, there is

13

a presumption that decisions made are strategic. *Id*. The Court has also held that "trial counsel's decision to not request a jury instruction falls under the category of trial tactics, which are not subject to review." *Neal v. State*, 15 So. 3d 388, 406 (¶43) (Miss. 2009) (finding that trial counsel's decision not to request the lesser offense manslaughter and mutilation jury instructions did not constitute ineffective of assistance of counsel); *see also Sea v. State*, 49 So. 3d 614, 619 (¶22) (Miss. 2010).

¶32. The Castle Doctrine, a category of justifiable homicide, is codified at Mississippi Code Annotated section 97-3-15(3)-(4) (Rev. 2014). It provides that:

> (3) A person who uses defensive force shall be presumed to have reasonably feared imminent death or great bodily harm, or the commission of a felony upon him or another or upon his dwelling, or against a vehicle which he was occupying, or against his business or place of employment or the immediate premises of such business or place of employment, if the person against whom the defensive force was used, was in the process of unlawfully and forcibly entering, or had unlawfully and forcibly entered, a dwelling, occupied vehicle, business, place of employment or the immediate premises thereof or if that person had unlawfully removed or was attempting to unlawfully remove another against the other person's will from that dwelling, occupied vehicle, business, place of employment or the immediate premises thereof and the person who used defensive force knew or had reason to believe that the forcible entry or unlawful and forcible act was occurring or had occurred. This presumption shall not apply if the person against whom defensive force was used has a right to be in or is a lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or is the lawful resident or owner of the dwelling, vehicle, business, place of employment or the immediate premises thereof or if the person who uses defensive force is engaged in unlawful activity or if the person is a law enforcement officer engaged in the performance of his official duties.

> (4) A person who is not the initial aggressor and is not engaged in unlawful activity shall have no duty to retreat before using deadly force under subsection (1)(e) or (f) of this section if the person is in a place where the person has a right to be, and no finder of fact shall be permitted to consider the person's failure to retreat as evidence that the person's use of force was

14

unnecessary, excessive or unreasonable.

Miss. Code Ann. § 97-3-15(3)-(4). The Castle Doctrine creates a presumption of fear and abridges a duty to retreat in certain prescribed circumstances. *Newell*, 49 So. 3d at 74 (¶22); *Woods*, 242 So. 3d at 54 (¶23).

¶33. In this case, before trial defense counsel filed a Castle Doctrine jury instruction, D-13. However, at trial, the defense revised this instruction to conform to the language of another section of the justifiable homicide statute, Mississippi Code Annotated section 97-3-15 (1)(e):

> (1) The killing of a human being by the act, procurement or omission of another shall be justifiable in the following cases:
>
> . . . .
>
> > (e) When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling, in any occupied vehicle, in any place of business, in any place of employment or in the immediate premises thereof in which such person shall be . . . .

Byrd argues that her attorney's action in failing to provide the original Castle Doctrine instruction constitutes ineffective representation. She says that the incident was more than a domestic dispute; rather, it was an eviction. Byrd told Harper to leave her home, and he refused. The State argues that Bryd was not entitled to a Castle Doctrine instruction because Harper was not in the process of unlawfully and forcibly entering the dwelling. The statute clearly says: "This presumption shall not apply if the person against whom defensive force was used has a right to be in the or is a lawful resident or owner of the building." Mississippi Code Annotated section 97-3-15(3).

15

¶34. In this case, although Byrd owned the home, she had allowed Harper to live with her for over a year. It was his residence as much as hers. Undoubtedly, she had the right to change her mind and ask him to leave, but his alleged refusal to do so immediately does not constitute an unlawful entry.

¶35. The cases raised by Byrd in her argument for a Castle Doctrine instruction, *Newell v. State*, 49 So. 3d 66 (Miss. 2010), and *Thomas v. State*, 75 So. 3d 1112 (Miss. Ct. App. 2011), are inapplicable. In *Thomas*, the defendant had shot into the air in a parking lot to stop a disturbance and then fled to his pick up truck. *Id*. at 113 (¶4). He was followed by a group of men who thought Thomas had shot at them. *Id.* They tried to get into his truck. *Id.* Ultimately, Thomas shot one of the men. *Id.* We held that Thomas was entitled to a Castle Doctrine instruction because there was a fact question as whether the attack on Thomas once he entered his truck was a separate chain of events. *Id.* at 1116 (¶14). *Newell*'s facts were similar to *Thomas*'s. In *Newell*, a husband was looking for his wife at a bar and exchanged harsh words with some men in the parking lot. *Newell*, 49 So. 3d at 68 (¶3). Newell retreated to his truck and tried to leave but he was followed by these men who tried to get in. *Id.* (¶4). Ultimately, Newell shot one of them. *Id.* The supreme court applied the Castle Doctrine and said Newell was occupying his vehicle and used defensive force when he was accosted. *Id.* at 74 (¶23). In this case, Byrd had not sought shelter in her home and was not fighting off an assault by an intruder. Rather she had a dispute there with someone she had allowed to live with her. The facts developed during trial did not warrant a Castle Doctrine instruction, and thus, there was no ineffective representation by defense counsel for failing

16

to propose one.

## CONCLUSION

¶36.    Finding no merit to the issues Byrd raises on appeal, we affirm.

¶37.    **AFFIRMED.**

**BARNES, C.J., CARLTON AND J. WILSON, P.JJ., GREENLEE, WESTBROOKS, TINDELL, LAWRENCE AND C. WILSON, JJ., CONCUR. McCARTY, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION.**

**McCARTY, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶38.    I agree with the majority's conclusions that prior bad acts were not used to tilt the trial against the defendant and that the prosecutor did not quite cross the line in closing. As to ineffectiveness of counsel, I must respectfully dissent, as I do not believe that we need to wade into the already murky waters of the Castle Doctrine. I believe that we should dismiss the claim of ineffectiveness without prejudice so it can be developed in a petition for post-conviction relief (PCR).

¶39.    Defense counsel actually constructed an instruction on the Castle Doctrine—but changed it, as nimble lawyers will, based on the facts of the case. "Whether to request a certain instruction generally is a matter of trial strategy." *McCoy v. State*, 147 So. 3d 333, 347 (¶36) (Miss. 2014). As the defendant points out, throughout pretrial hearings, voir dire, and a request for a directed verdict, defense counsel stated this was a Castle Doctrine case but did not actually request an instruction on the defense. This certainly feels like trial strategy, regardless of the application of the Castle Doctrine in precedent. Yet from a cold record on direct appeal we do not know whether this was indeed trial strategy or if counsel

17

was just in conflict with the defendant.

¶40.    With this particular record, I believe we should follow the lead of the Supreme Court in *McCoy* and find that "[t]his claim more appropriately would be brought in a petition for [PCR]" and "dismiss [the] ineffective-assistance claim, regarding [the] attorney's failure to request a cautionary instruction, without prejudice so that [the defendant] may raise this claim in a properly filed" PCR petition. *Id*.

¶41.    I believe that when possible we should address claimed errors of ineffective assistance on direct appeal—such as whether a lawyer failed to perform an essential function of representation. In more nebulous scenarios such as whether it was trial strategy to not ask for an instruction of this type, we should allow a petitioner to develop it through a PCR petition, which should be accompanied with evidence or affidavits beyond a mere assertion that counsel was ineffective.

¶42.    For the foregoing reasons, I concur in part and dissent in part.