# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2020-KA-00346-COA

TROY ANTHONY PICCALUGA A/K/A TROY PICCALUGA             APPELLANT

v.

STATE OF MISSISSIPPI             APPELLEE

| | |
|---|---|
| DATE OF JUDGMENT: | 03/19/2020 |
| TRIAL JUDGE: | HON. TONI DEMETRESSE TERRETT |
| COURT FROM WHICH APPEALED: | WARREN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER BY: W. DANIEL HINCHCLIFF |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL BY: META S. COPELAND |
| DISTRICT ATTORNEY: | RICHARD EARL SMITH JR. |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 11/23/2021 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

### BEFORE WILSON, P.J., McCARTY AND SMITH, JJ.

### WILSON, P.J., FOR THE COURT:

¶1. Troy Piccaluga was indicted on two counts of statutory rape pursuant to Mississippi Code Annotated section 97-3-65(1)(a) (Rev. 2020) and on one count of sexual battery by sexual penetration pursuant to Mississippi Code Annotated section 97-3-95(1)(c) (Rev. 2020). Following a jury trial, he was convicted of one count of statutory rape and sexual battery and later sentenced. The jury was unable to reach a verdict on the remaining count of statutory rape, and the trial judge declared a mistrial on that charge. On appeal, Piccaluga argues that the trial judge erred by denying his motion to suppress a portion of his recorded

interview with law enforcement, by allowing "repeated instances of improper prosecutorial comment," by allowing the use of a transcript of a recorded telephone call, and by permitting a lay witness to give improper opinion testimony. We find no reversible error and affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2. In August 2017, Camille Eiland, a counselor at Warren-Yazoo Behavioral Health began treating a young woman, Vickie,[1] for depression. Eiland testified at trial that Vickie's mother brought her there for treatment. After a few months, Vickie's mother told Eiland that she was concerned about Vickie's relationship with Vickie's pastor, Troy Piccaluga. Vickie's mother had seen some text messages between Vickie and Piccaluga that concerned her. At a session in late February 2018, Eiland tried to broach the topic with Vickie. Eiland testified that Vickie did not "seem to really understand problems" with the relationship. Vickie told Eiland that she and Piccaluga were alone together often, that they had gone swimming together, that they texted often, and that they told each other, "I love you." Eiland was concerned by what Vickie told her, and she tried to discuss her concerns with Vickie. At a session in late March, Eiland again asked Vickie about Piccaluga, and Vickie started crying. Eiland testified that Vickie sat and cried silently for "a very long time." Eiland passed Vickie some paper and told her to write down anything she wanted to tell her.

¶3. The note Vickie wrote in her session with Eiland was admitted as an exhibit at trial. It said, "It doesn't matter what I do or don't say. I'm going to lose almost everything that makes me happy. Troy will probably hate me. I'll lose my best friend and my riding lessons.

---

[1] Aliases are used to protect the identities of the victims.

We all die eventually, so what would it matter if I did now. I just want everything to end." The note also discussed missing a friend and being "put in a straight jacket and stuck in a white marshmallow room." Based on Vickie's note, Eiland was concerned that Vickie might try to harm herself. Therefore, Eiland made preparations for Vickie to be admitted to the psychiatric ward of the hospital.

¶4. Eiland testified that Vickie also wrote an unprompted second note that stated, "I made him do it. I wanted him to make me forget about Kris trying to do things with me. I didn't want it with Kris. I only let him to make him happy. I was scared he'd hate me if I didn't. I wanted Troy to do it because I know he actually cares about me. Kris just wants me as a toy, not a sister. I'm sorry." Eiland then wrote, "Tell me what 'it' is." And Vickie wrote, "Have sex." Vickie wrote some other things about wanting the bad memory replaced with good ones and that "Josh tried things too." Eiland wrote, "How many times?" And Vickie wrote, "Troy one or two. One may have been a dream. I know that's weird. I think so. Kris I don't even know. Josh one." Vickie was fifteen years old at the time. Therefore, Eiland contacted the Warren County Sheriff's Department to let them know about the possible sexual abuse of a minor.

¶5. Vickie was admitted to the psychiatric ward of the hospital, where she was treated for several days. Eiland continued to treat Vickie after she was discharged. Eiland testified that Vickie continued to maintain that she had a sexual relationship with Piccaluga. Later in their counseling, Vickie would disclose that she and Piccaluga had sex more than ten times, but she was unsure of the exact number. Eiland was also able to learn that "Kris" and "Josh,"

3

who were mentioned in Vickie's note, were Vickie's stepbrothers and lived out of state. Eiland reported those allegations of abuse to the authorities as well.

¶6.    Eiland testified that she did not know whether Vickie's allegations were true. She noted that Vickie never changed the language she used when she referred to her relationship with Piccaluga. Another counselor at the hospital testified that it was not their job as counselors to evaluate the truthfulness of the allegations but that it was their role to report abuse allegations to law enforcement.

¶7.    Investigator Todd Dikes of the Warren County Sheriff's Department was contacted regarding the possible sexual abuse of Vickie. While Vickie was in the hospital, Dikes discussed Vickie's disclosures with Vickie's mother and arranged for Vickie to be interviewed by the Child Advocacy Center (CAC) in Jackson. Dikes observed the CAC interview through a closed-circuit television. During the CAC interview, Vickie again disclosed that she and Piccaluga had a sexual relationship. Vickie also mentioned another girl, Tina, who knew about her relationship with Piccaluga.

¶8.    After Vickie was released from the hospital, Dikes arranged for a monitored phone call between Vickie and Piccaluga. A recording of the phone call was played at trial. In the conversation, Vickie told Piccaluga that her period was late, and she asked him what she should do about it. He told her that she should "chill out for now" and doubted that her period could be late. He said, "If you remember, we haven't even—well, never mind."

¶9.    Piccaluga asked Vickie if she was still using Instagram and if it was "safe." He asked her if she had been deleting their messages. He questioned whether she would "betray him,"

4

whether she was "on [his] side," and if he was "in danger." He also mentioned that Tina was "freaking [him] out" because she was going to "snitch." He said he was in "panic mode." He ended the phone call by telling Vickie that he loved her and missed her.

¶10. After listening to the phone conversation between Vickie and Piccaluga, Dikes decided that he needed to talk to Tina. He went to Tina's house and spoke with her and her mother. He explained that Tina's name had come up in an investigation involving Piccaluga and Vickie, and he asked Tina if she had any information about their relationship. Tina then asked her mother to leave the room and disclosed to Dikes that she also had sex with Piccaluga. Tina told Dikes that she had sex with Piccaluga at the Eagle Lake Methodist Church when she was fourteen years old. Dikes testified that he was surprised by Tina's disclosure because he had not known that she was also a victim.

¶11. Dikes obtained search warrants for Piccaluga's home and Eagle Lake Methodist Church. At the church, Dikes took photographs of some of the furniture because Tina and Vickie had described the furniture in the room where they had sex with Piccaluga. Tina and Vickie gave their statements separately, but both accurately described the room. Tina stated that Piccaluga used condoms, and one of the girls told Dikes that Piccaluga kept the condoms on his boat at his home. A box of condoms was found hidden on Piccaluga's boat.

¶12. Piccaluga met with Dikes at the sheriff's department for an interview. At the beginning of the interview, Dikes informed Piccaluga of his *Miranda* rights, which Piccaluga then waived. During the interview, Dikes told Piccaluga about the allegations made by Vickie, which Piccaluga denied. Piccaluga said that Vickie was a family friend and that he

5

treated her like a daughter. He told Dikes that maybe she was making these accusations because of her mother, but he did not elaborate.

¶13. Piccaluga and Dikes discussed the phone call Piccaluga had with Vickie. At that time, Piccaluga did not know that the phone call had been recorded. He told Dikes that he and Vickie discussed that she had been in the hospital because of self-harm, and he did not mention that she had told him her period was late. After Lieutenant Randy Lewis joined the interview, he revealed to Piccaluga that his phone conversation with Vickie had been recorded. Lewis told him that they had statements from Vickie, the recorded phone call, and Instagram messages between him and Vickie.

¶14. Lewis had not actually obtained any Instagram messages between Piccaluga and Vickie. He testified that his office was not able to recover any such messages. He testified that they had seized Piccaluga's iPhone, but they were unable to access it because they did not know Piccaluga's passcode. Lewis testified that no child pornography had been found on any of Piccaluga's other electronic devices.

¶15. Vickie testified that she started seeing Eiland in August 2017 because she was suffering from depression and had isolated herself from her friends and family. She said that she had been going to Eagle Lake Methodist Church and had known its pastor, Piccaluga, since she was in the sixth grade. Vickie and Piccaluga's daughter, Hannah, were friends, and Hannah had invited Vickie to church. Vickie testified that she and Hannah were together almost every weekend and that she had spent a lot of time at Piccaluga's house. Vickie said that she and Hannah liked to ride horses together.

6

¶16. Vickie testified that until 2017, her relationship with Piccaluga was normal and like a father-daughter relationship. She said that she discussed her depression and anxiety with Piccaluga, and he told her about his own issues with depression and anxiety. Vickie testified that she "looked at [Piccaluga] like a dad" and that she "talked to him easily." In December 2017, their relationship changed and became "more intimate." Vickie spent the night at the Piccaluga home, and Piccaluga woke her up early the next morning. Vickie testified that while she was still "half asleep," Piccaluga kissed her, and "it just went from there."

¶17. A few weeks later, Vickie and Piccaluga were alone at Piccaluga's home after church and had sexual intercourse. Vickie did not provide specifics about the incident but testified they "just had sex." She said they were in Piccaluga's bedroom, and he used condoms. She said they had sex other times at Piccaluga's home and at his church. Vickie said that Piccaluga kept his condoms in a boat at his house. She could not remember the brand, but her description matched the photograph of the condoms later found on Piccaluga's boat.

¶18. Vickie testified that in early March 2018 she was alone at Piccaluga's church with Piccaluga and her friend Tina, who also attended the church. Vickie testified that after they finished a Bible study, she began performing oral sex on Piccaluga, and then Tina "got involved." Piccaluga asked Tina if she wanted to have "actual sex," and she implied that she did not. Piccaluga asked Tina if she would be okay if he wore a condom, and while Tina never said anything in response, things "just kind of went from there." Eventually, Tina both performed oral sex on Piccaluga and engaged in sexual intercourse with him. Vickie acknowledged that she did not mention Tina during her CAC interview. She testified that

7

she did not want to get Tina in trouble. Tina knew of Piccaluga's relationship with Vickie prior to the incident at the church.

¶19. Vickie testified that she had told Eiland about her relationship with Piccaluga because she felt like her mother and Eiland already knew about it and that there was no point in trying to hide it any longer. She did not tell Eiland the true number of times she had sex with Piccaluga because at that time she still cared about him and thought she could protect him. Piccaluga had told Vickie that when she turned eighteen, he would leave his wife to be with her, and Vickie still believed him when she initially disclosed the relationship to Eiland.

¶20. Tina testified that she and Vickie became good friends sometime before 2018 when they lived on the same street. Tina and her family went to a different church, but Vickie asked her to come to Eagle Lake Methodist for Bible study. Tina did not know Piccaluga or his daughter, Hannah, previously. Tina, Vickie, and Hannah attended the first Bible study with Piccaluga. Tina testified that while a video was played, Vickie and Piccaluga left the room and were gone for thirty minutes or so.

¶21. Previously, Vickie had told Tina that she was in a relationship with a man, but Tina did not realize that the man was Piccaluga. The next time Tina went to Bible study with Vickie, Piccaluga picked them up from Vickie's house. Hannah was not there that day. When they got to the church, they watched TV and ate popcorn in a dining area. Tina said she did not believe Vickie was actually in a relationship with Piccaluga, so she dared Vickie to sit on his lap and kiss him. Vickie did so.

¶22. Later, they left the dining area and went into Piccaluga's office. Vickie and Piccaluga

8

began kissing, and Vickie tried to involve Tina. Tina testified that Vickie and Piccaluga eventually "coerced" her into joining them. Tina testified that she did not kiss Piccaluga. Rather, Vickie was performing oral sex on Piccaluga, and they "coerced" her into doing it too. She said Vickie helped her take off her clothes, and Piccaluga took them to the couch. Then Vickie performed oral sex on Tina while Piccaluga had sex with Vickie from behind. Then Vickie and Tina switched positions.

¶23. Tina testified that she said she was not comfortable with what was happening. She testified that she said "no" and that Piccaluga waved a condom in her face. She did not recall if he said anything at the time. She said both Vickie and Piccaluga coaxed her into the situation. After Tina and Vickie went back to Vickie's house, Tina left. She did not tell anyone what had happened because she was scared.

¶24. Tina said that she and Vickie were no longer friends and did not talk much after the March 2018 incident. When Dikes came to Tina's house to ask her about Vickie and Piccaluga, Tina still had not told her parents about the incident. Tina said that her family was suing the Methodist Church, but she did not know the details and denied that she had discussed her testimony with her attorneys in that case.

¶25. Hannah Piccaluga testified that she met Vickie when they were in the sixth grade. She said that she and Vickie were best friends and that Vickie was at their house frequently. She testified that when Vickie spent the night, they usually slept in the living room. Vickie was treated like a family member. Hannah also testified that her family often found Vickie going through their belongings.

9

¶26. Piccaluga preached at two churches on Sunday: at Eagle Lake at 9 a.m. and at Redwood at 11 a.m. Hannah testified that she and her mother usually attended only one of the two services. If Vickie had spent the night at their house, they would go to Eagle Lake so they could take Vickie home. Hannah testified that if she went to the 11 a.m. Redwood service, her father was usually already gone by the time she even woke up. She said that her father tried to start a youth group at Eagle Lake, but only Vickie and Hannah attended regularly. Tina attended only a few times. On one occasion, Hannah was sick and did not attend a youth group meeting. But she could not recall a time when her father and Vickie would have been alone together at church or at their home.

¶27. Piccaluga's wife, Amy, similarly testified that Vickie and Hannah were close friends and that they treated Vickie like a member of their family. She testified that she saw no evidence of an inappropriate relationship between Piccaluga and Vickie. Amy also testified that she and Piccaluga had a "normal" sexual relationship. She denied that Vickie and Piccaluga were ever at their house alone. Piccaluga had never been the subject of any similar allegations, and Amy testified that she was shocked by the allegations.

¶28. Amy said that when Vickie stayed at their house on Saturday night, Piccaluga would sometimes take her home on Sunday on his way to the early service at Eagle Lake. On cross-examination, Amy admitted that there was an occasion when Vickie and Piccaluga might have driven alone to Eagle Lake and then back to Redwood later in the morning.

¶29. Pastor Robbie Murden testified that there were no complaints or concerns when Piccaluga was the youth minister at his church. Murden testified that he would still trust

Piccaluga with children. Two former members of Piccaluga's youth groups, both of whom had babysat for the Piccalugas in the past, testified that they had never felt uncomfortable around Piccaluga and that he had never made any inappropriate advances toward them.

¶30. Piccaluga testified in his defense. He said that he left for church at Eagle Lake around 8:30 a.m. on Sundays and that his family would alternate which service they attended. There would be a fellowship breakfast after the service at Eagle Lake that he attended before driving to Redwood. He denied that he was ever alone with Vickie on a Sunday morning, as she had described in her testimony.

¶31. Piccaluga testified that he had been in the process of starting a youth group and a Sunday evening youth Bible study at Eagle Lake. However, Eagle Lake was a small church, and Hannah and Vickie had been the only teenagers who attended regularly.

¶32. Piccaluga claimed that Vickie told him that she and Tina were romantically involved. Piccaluga testified that Tina came with Vickie to the Bible study a few times. On one occasion, Hannah did not attend the Bible study because she was sick, and Piccaluga went to Vickie's house to pick up her and Tina and take them to the church. He testified that he thought nothing of being alone with them because Vickie was like a daughter to him.

¶33. Piccaluga testified that they had a normal Bible study but that the girls did not seem to be paying attention. He said that Tina and Vickie were giggling and chatting a lot, so he had to correct them. He said that eventually he gave up and stopped trying to get them to focus on the lesson. He could not remember what Vickie and Tina were talking about, but he denied that he talked to them about anything sexual in nature. He said that other than the

11

girls not paying attention, the Bible study was perfectly normal. He denied that he had sex with either girl at the church, and he denied that the girls went to his office with him.

¶34. Piccaluga said that he treated Vickie like a daughter and that she had confided in him. He said he was reluctant to discuss some of those confidences with the officers during his interview because, as her pastor, he tried to respect her privacy. He denied there ever being inappropriate contact between him and Vickie. He testified that he did not know why she made such allegations against him.

¶35. Piccaluga admitted that he had given Vickie his old iPhone when he got a new one. He testified that he did not install Instagram on the phone, though he admitted that he communicated with Vickie via Instagram. He said that Vickie wanted to share certain things with him that she did not want her mother to know about, and they communicated on Instagram because her mother could read her text messages. He said that Vickie told him that she cried a lot and fought with her mother a lot. He testified that Vickie told him that her stepfather would come into her bedroom without knocking while she was dressing. He said that Vickie confided with him about these and other issues for about two years.

¶36. Piccaluga testified when Vickie was hospitalized in March 2018, he could not get in touch with her, and when he texted Vickie's mother, he received only terse responses. He tried to contact Tina to see if she knew what was going on with Vickie. Piccaluga said that Tina's response blamed him for Vickie's hospitalization. He testified that at the time, he thought that Tina was angry because he and Vickie were close and that Tina considered him to be responsible for Vickie's well-being. Piccaluga testified that this explained his comment

during his recorded phone conversation with Vickie that Tina was "freaking [him] out." Piccaluga also testified that he asked Vickie if he was "in danger" because of the Instagram messages he had been exchanging secretly with Vickie.

¶37.	In a further attempt to explain the recorded phone conversation, Piccaluga testified that he was knowledgeable about Vickie's menstrual cycle because she complained about it frequently and told him that she had very painful periods. He testified that he had said that he was in "panic mode" because of Tina's statement that it was his fault Vickie had been hospitalized. He testified that he told Vickie he loved her only because he loved her like a daughter. He claimed that Vickie knew where he kept condoms only because she frequently snooped around his house. He stated that the condoms were his but that he did not use them with his wife. He stated that he kept the condoms on his boat "for personal reasons you might would call or you would call masturbation."

¶38.	Piccaluga could not explain why Vickie would make such accusation against him after he had treated her like a daughter. He could only say that Vickie was "troubled."

¶39.	A Warren County grand jury returned a three-count indictment against Piccaluga. Count 1 charged with him with statutory rape for engaging in sexual intercourse with Tina when she was fourteen years old. Count 2 charged him with statutory rape for engaging in sexual intercourse with Vickie when she was fifteen years old. Count 3 charged him with sexual battery for engaging in sexual penetration with Vickie while she was more than fourteen years old but less than sixteen years old. The jury was unable to reach a unanimous verdict on Count I, statutory rape of Tina, and the trial judge declared a mistrial on that

13

count. However, the jury found Piccaluga guilty of Count 2 (statutory rape of Vickie) and Count 3 (sexual battery of Vickie). The court sentenced Piccaluga to consecutive terms of thirty years and twenty-five years (with twenty years to serve and five years suspended) in the custody of the Department of Corrections. Piccaluga filed a motion for judgment notwithstanding the verdict or a new trial, which was denied, and a notice of appeal.

¶40. On appeal, Piccaluga argues that (1) the trial court should have suppressed a portion of the video of his interrogation because he invoked his right to speak to an attorney; (2) the prosecutors made a series of improper and prejudicial comments in the presence of the jury; (3) the trial court erred by allowing the use of a transcript of the recorded phone call between him and Vickie; and (4) the trial court erred by allowing a law enforcement officer to give opinion testimony when he had not been tendered and accepted as an expert witness. Piccaluga does not challenge the sufficiency or weight of the evidence against him.

## ANALYSIS

### I. Interrogation Video

¶41. Piccaluga argues that the trial judge should have granted his motion to suppress part of his videotaped interrogation interview. He argues that after he told officers he wanted to "talk to someone else," they should have ended the interview, and because they did not do so, all of the interview that follows should have been suppressed.

¶42. "We will only reverse a trial court's denial of a motion to suppress 'if the ruling is manifest error or contrary to the overwhelming weight of the evidence.'" *Moore v. State*, 287 So. 3d 905, 911 (¶20) (Miss. 2019) (quoting *Barnes v. State*, 30 So. 3d 313, 316 (¶8)

14

(Miss. 2010)). A suspect must "be advised of his right to remain silent and his right to counsel before any custodial interrogation," but once he has been advised of his rights, he "may waive [his] rights and respond to interrogation." *Id.* at 912 (¶20) (quoting *Jordan v. State*, 995 So. 2d 94, 106 (¶30) (Miss. 2008)).

¶43.    Piccaluga acknowledges that he knowingly, intelligently, and voluntarily waived his *Miranda* rights at the beginning of the interrogation. Piccaluga and Dikes discussed Vickie's allegations and the recorded phone call between Piccaluga and Vickie. At that time, Piccaluga did not know that the phone call had been recorded. He told Dikes that he and Vickie discussed that she had been in the hospital because of self-harm. He did not mention that she had told him her period was late. Dikes left the room and returned with Lewis, who subsequently told Piccaluga that the phone call had been recorded. After further questioning, Piccaluga asked Dikes and Lewis what they wanted him to say, and Lewis said they just wanted the truth. Eventually, Piccaluga asked for some hypothetical scenarios about the way his situation could turn out. Dikes said that things generally turned out better for those who confessed and told the truth. Piccaluga said, "It's not that I don't wanna cooperate. I don't wanna open my mouth and say things if I don't know the whole story yet." Dikes and Lewis said they would tell Piccaluga the truth if he told them the truth. Lewis told Piccaluga that there was "no reason in the world" he should have known whether Vickie's period was late. Piccaluga then said, "I wanna cooperate, but I want to be able to talk to someone else about where I am. I've never been in this position before in my life. I don't know anybody that has." Lewis responded, "Well that's what [Dikes] told you. Once you don't want to, or

15

don't want to answer a question, you don't have to." Lewis said it was just a conversation to confirm information he had already received.

¶44. Dikes left the room while Lewis and Piccaluga continued talking. Piccaluga asked how talking would help him, and Lewis said it would help for him and the district attorney to know Piccaluga's side of the story. Piccaluga then said, "I think I would rather filter some of this," and Lewis left to call the district attorney about charging Piccaluga.

¶45. Piccaluga argues that he invoked his right to remain silent and/or his right to counsel when he stated, "I wanna cooperate, but I want to be able to talk to someone else about where I am." He further argues that Dikes and Lewis should have stopped the interview immediately and that the remainder of the interview should have been suppressed.

¶46. In *Davis v. United States*, 512 U.S. 452 (1994), the Supreme Court held that a "suspect must unambiguously request counsel" in order to invoke his right to counsel under *Miranda*. *Davis*, 512 U.S. at 459. The Court "decline[d] to adopt a rule requiring officers to ask clarifying questions." *Id.* at 461. Instead, the Court held that "officers have no obligation to stop questioning" a suspect until the suspect makes "an unambiguous or unequivocal request for counsel." *Id.* at 462. In *Berghuis v. Thompkins*, 560 U.S. 370 (2010), the Supreme Court extended *Davis*'s holding to a suspect's invocation of the *Miranda* right to remain silent. *Id.* at 381-82.

¶47. In *Moore*, *supra*, the Mississippi Supreme Court held that officers are permitted to ask questions to "clarify an ambiguous invocation" of the right to remain silent or to counsel. *Moore*, 287 So. 3d at 914 (¶33). But in *Saddler v. State*, 297 So. 3d 234 (Miss. 2020), the

Court "held that such clarifying questions are not *required*." *Id.* at 239 (¶13) (emphasis added). Therefore, it is now clear, under both the Federal Constitution and the Mississippi Constitution, that officers have no obligation to stop questioning a suspect in the absence of an unambiguous or unequivocal request for an attorney or assertion of the right to remain silent. *Id.*

¶48. Against this backdrop, the trial judge did not err by admitting relevant portions of the Piccaluga's recorded interview. Piccaluga's statement, "I wanna cooperate, but I want to be able to talk to someone else about where I am," was not an unambiguous or unequivocal invocation of either his right to remain silent or his right to an attorney. Therefore, officers did not have to stop questioning him at that time.

## II. Prosecutors' Statements

¶49. Piccaluga argues that the prosecutors made several references to his silence or the nature of his charges that were intended to prejudice the jury and deny him a fair trial. Specifically, he alleges that four statements by the prosecutors and one question to Dikes amounted to "prosecutorial misconduct."

¶50. An improper argument by a prosecutor may require reversal if "the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Fortenberry v. State*, 191 So. 3d 1245, 1251 (¶18) (Miss. Ct. App. 2015). But "any allegedly improper prosecutorial comment must be considered in context." *Id.* (brackets omitted). Counsel on both sides are "allowed considerable latitude" in arguing the case. *Id.* They are not strictly "limited to the

17

facts introduced into evidence" but may also "argue the deductions and conclusions that may reasonably be drawn therefrom." *Id.* That said, "the trial judge should intervene to prevent unfair argument" when counsel "departs entirely from the evidence, makes statements intended solely to excite the passions or prejudices of the jury, or makes inflammatory and damaging statements of fact not found in the evidence." *Coleman v. State*, 289 So. 3d 1221, 1224 (¶8) (Miss. Ct. App. 2020) (quotation marks, brackets, and ellipsis omitted) (quoting *Moffett v. State*, 156 So. 3d 835, 857 (¶61) (Miss. 2014)). On such issues, we give deference to the trial court's rulings "because the trial court is in the best position to determine if an alleged improper comment had a prejudicial effect." *Jones v. State*, 962 So. 2d 1263, 1275 (¶45) (Miss. 2007).

¶51. In addition, opening and closing arguments of counsel are not evidence, and "reversal is not required when a jury is properly instructed that statements made by counsel are not evidence." *Brisco v. State*, 295 So. 3d 498, 519-20 (¶59) (Miss. Ct. App. 2019), *cert. denied*, 293 So. 3d 834 (Miss. 2020). In this case, the jurors were properly instructed: "Arguments, statements and remarks of counsel are intended to help you understand the evidence and apply the law, but are not evidence. If any argument, statement or remark has no basis in the evidence, then you should disregard that argument, statement or remark."

### A. "probably the most heinous crime that exists"

¶52. In the State's opening statement, one of the prosecutors stated, "What Mr. Piccaluga is charged with, in my opinion, is probably the most heinous crime that exists. I can sit here and understand murders and I can understand the manslaughter—" Piccaluga's counsel

18

objected that the prosecutor should "layout what the evidence will be, not to give a closing argument." The prosecutor told the judge that he was "getting to it," and the judge stated simply, "Proceed."[2]

¶53. On appeal, Piccaluga argues that this remark requires reversal because it was a "highly prejudicial and inflammatory personal opinion which was intended to elevate the charge against" him. However, this is not the objection that he raised at trial. "A defendant is procedurally barred from raising an objection on appeal that is different than that raised at trial." *Jones v. State*, 606 So. 2d 1051, 1058 (Miss. 1992). Regardless, the prosecutor's comment regarding the seriousness of the crimes Piccaluga was charged with did not unfairly prejudice Piccaluga or deny him a fair trial.

### B. "the worse [sic] thing or . . . best piece of evidence"

¶54. During the State's opening statement, the prosecutor also stated, "The worse [sic] thing or best thing, the best piece of evidence that you are going to hear in this case, in my opinion, is Troy Piccaluga says to [Vickie] on that phone call, 'I'm nervous about [Tina].'" On appeal, Piccaluga argues that this was an improper insertion of the prosecutor's personal opinion and an inflammatory comment on the evidence. However, Piccaluga did not make a contemporaneous objection to this comment; therefore, the issue is waived. *Walters*, 720 So. 2d at 864 (¶23). Regardless, in context, the statement was a fair comment on the evidence against Piccaluga and was not unfairly prejudicial.

---

[2] Piccaluga correctly notes that the judge did not rule on this objection. When an objecting party fails to obtain a definitive ruling and requests no corrective action, the objection generally is waived. *Walters v. State*, 720 So. 2d 856, 864 (¶25) (Miss. 1998).

19

### C. "picture yourself . . . sitting in that interview room"

¶55. Piccaluga also objected to the following portion of the State's opening statement:

> STATE: You're also going to hear that Troy Piccaluga came to the . . . sheriff's department for an interview . . . . When you hear that statement, picture yourself . . . sitting in that interview room—
>
> BONNER: Objection, Your Honor. It's absolutely improper to ask the jury to put themselves in the position of the defendant.
>
> STATE: I'll restate it, your honor.
>
> COURT: Please restate it.
>
> BONNER: Your Honor, I'd ask for a mistrial at this point. That can't be unrung.

¶56. After hearing argument outside the jury's presence, the trial judge overruled the objection, reasoning that the prosecutor had not gone too far and that no "irreparable harm" had been done. However, at Piccaluga's request, the judge instructed the jury that she had sustained the objection and that they should disregard the prosecutor's comment.

¶57. In general, "a golden-rule argument, which asks the jurors to put themselves in the place of one of [the] parties, is impermissible." *Evans v. State*, 226 So. 3d 1, 31 (¶79) (Miss. 2017). However, as stated above, reversal is required only when "the natural and probable effect of the improper argument is to create unjust prejudice against the accused so as to result in a decision influenced by the prejudice so created." *Fortenberry*, 191 So. 3d at 1251 (¶18). Moreover, we give deference to the trial judge's ruling, as she heard the comment and was in the best position to assess its likely effect on the jury. Here, the trial judge did not abuse her discretion by ruling that no irreparable harm had been done and that no mistrial

was required.

> ### D. "Has all the evidence that you collected indicate that these girls are lying?"

¶58. On cross-examination, Piccaluga's counsel questioned Investigator Dikes about the possibility that Vickie and Tina were "lying":

Q:     Everything that happened after you received this report is based on the children's statement; is that correct?

A:     Yes, on the children's statements and the recording that we had.

Q:     Sure. What if they're wrong?

A:     I'm sorry?

Q:     What if they're lying?

A:     All I can do is go by the evidence that I have.

Q:     Sure. What evidence did you look for to determine whether or not they're lying?

In response, Dikes mentioned Vickie's CAC interview.

¶59. On redirect examination, one of the prosecutors asked Dikes, "Has all the evidence that you collected indicate that these girls are lying?" Dikes answered, "No." The prosecutor then asked, "What does it indicate?" Piccaluga's attorney objected that "[t]hat [was] a matter for the jury to determine." In response, the State maintained that Piccaluga had opened the door to the question. The trial judge overruled the objection, and Dikes testified that he "believe[d] what the girls said," i.e., "that a crime ha[d] been committed."

¶60. The trial judge did not abuse her discretion by overruling Piccaluga's objection. Piccaluga's cross-examination of Dikes invited the objected-to question on redirect. Both

21

attorneys essentially asked Dikes whether the evidence could indicate that the young women were lying.

### E. "I would still trust her"

¶61. Finally, Piccaluga argues that one of the prosecutors improperly "vouched" for Vickie during closing argument and offered his own opinion for her truthfulness by stating:

> They want you to think that [Vickie] at 15 years old had everything going and for a reason that nobody on that side of the table can explain, threw it all away. And, you know, if it was just her word—well, I would still trust her if it was just her word against Piccaluga, but that's not just her word. All the other testimony goes along with what she's saying.

¶62. Piccaluga is correct that a prosecutor should never personally vouch for the credibility of a witness. *Manning v. State*, 735 So. 2d 323, 344 (¶45) (Miss. 1999); *Abram v. State*, 309 So. 3d 579, 586 (¶¶20-21) (Miss. Ct. App. 2020), *cert. denied*, 309 So. 3d 451 (Miss. 2021); *see also* Miss. R. Prof'l Conduct 3.3 cmt. ("[A]n advocate does not vouch for the evidence submitted in a cause; the tribunal is responsible for assessing its probative value."); Miss. R. Prof'l Conduct 3.4(e) ("A lawyer shall not . . . in trial, state a personal opinion as to . . . the credibility of a witness . . . ."). However, Piccaluga did not object to this statement at trial, so this issue is waived. *Abram*, 309 So. 3d at 586 (¶17). Moreover, in context, this argument was not so prejudicial or inflammatory as to warrant reversal. *Id.* at 585-86 (¶¶16, 21).

### III. Transcript of the Phone Call

¶63. Piccaluga argues that the jury should not have been given a transcript of the recorded phone call between him and Vickie. He argues that the transcript did not help the jury understand the evidence but actually supplanted the evidence. He points out that Dikes

22

testified that some of the statements made on the phone call were difficult to hear and understand and that it was better to listen with headphones on or with a transcript.

¶64. The Mississippi Supreme Court and this Court have repeatedly approved of the practice of allowing jurors to have transcripts of a recording as long as an appropriate cautionary instruction is given. *Dye v. State*, 498 So. 2d 343, 344 (Miss. 1986); *Coleman v. State*, 697 So. 2d 777, 784-85 (Miss. 1997) (noting that the transcripts should be retrieved from the jurors so that the transcripts cannot be used during deliberations); *Franks v. State*, 749 So. 2d 1241, 1243-44 (¶¶7-8) (Miss. Ct. App. 1999) ("Transcripts can be used to assist the jury in determining who is speaking and discerning what is being said, as long as the transcript is not improperly suggestive where the tape is indecipherable."); *Fulgham v. State*, 46 So. 3d 396, 398-99 (¶¶8-15) (Miss. Ct. App. 2010) (holding that the defendant must request an instruction on the use of the transcript); *Keller v. State*, 138 So. 3d 817, 856 (¶97) (Miss. 2014); *Farris v. State*, 906 So. 2d 113, 120-21 (¶22-24) (Miss. Ct. App. 2004); *Page v. State*, 269 So. 3d 440, 450-51 (¶¶26-27) (Miss. Ct. App. 2018).

¶65. In this case, Dikes testified that he helped to set up a recording of a phone call between Vickie and Piccaluga. He also testified that the recording was sometimes not easy to understand because Vickie and Piccaluga "talked low" and "talk[ed] over" each other. He said it was "better if you could listen to it with headphones on or had some type of transcript." Dikes testified that the transcript produced by the State was accurate and reflected the conversation between Piccaluga and Vickie. Piccaluga objected:

> BONNER: Your honor, I object. The witness has just said that he listened to . . . the disk, and that it is difficult to understand. Therefore,

23

what you got there is his or somebody's interpretation of what was said. The best evidence is that disk, your honor. This is extraneous, and he just said it's hard to understand. The jury should be able to understand for themselves, not hear somebody else's interpretation of what they think they heard. So I do object to this, your honor.

COURT: Were you able to understand the phone call yourself, Investigator Dikes? Did you listen to it with headphones on?

DIKES: I did. I listened to it several times.

COURT: And did you follow —

DIKES: It is hard to understand.

COURT: Okay. When the transcript was completed, did you follow along with the transcript?

DIKES: I did. And it made it a lot easier to understand.

COURT: So once you saw the transcript, you understood what was being said. But before you had the transcript, you did not understand. Is that what you're saying?

DIKES: Not all of it. Yeah, I mean, just parts of it. Parts of it were hard to hear. And then when it was transcribed out, of course you could understand what they were saying then.

BONNER: Your honor, that's my objection. Once you tell somebody this is what you're listening to, they accept that as true. The burden of the jury is to be the finder of fact and determine what is true. I've known [Dikes] since he was in the 8th grade. He's not lying. I get that. But what you're talking about is his interpretation of what he heard and what the transcriber heard. And the best evidence is for the jury to make that determination. They're the finder of fact. That's their job.

The trial judge allowed the transcript to be marked for identification and copies were distributed to the jurors. After the recording was played, the transcripts were collected from

24

the jurors. In addition, prior to deliberations, the jurors were instructed that "the transcript itself is not evidence. The recorded call itself is the primary evidence of what was said between the alleged victim and Troy Piccaluga. And if your interpretation of the conversation after listening to the recording is different than that of what is contained in the transcript, you must follow your own interpretation."

¶66. The trial judge did not abuse her discretion by allowing limited use of the transcript in this case. Dikes authenticated the transcript as accurate, the jurors were able to listen to the recording for themselves, the copies of the transcript were retrieved from the jurors after the recording was played, and the jurors were instructed that the evidence was the recording, not the transcript. Moreover, Piccaluga has not argued that any particular part of the transcript was inaccurate, misleading, or prejudicial. We have also reviewed the transcript and recording and have identified no material or prejudicial discrepancies. Based on the above-cited cases holding that such use of a transcript is permissible, the trial judge did not abuse her discretion, and this issue is without merit.

### IV. Investigator Dikes's Testimony

¶67. Piccaluga also argues that the trial judge erred by allowing Investigator Dikes, a lay witness, to give improper "opinion" testimony on "the ultimate issue of guilt or innocence." Piccaluga's argument is based on the same testimony discussed above in section II.D regarding the possibility that Vickie and Tina were "lying" and whether the evidence indicated that they were lying.

¶68. In *Rose v. State*, 556 So. 2d 728 (Miss. 1990), the Supreme Court held that the trial

judge erred by allowing a sheriff to give opinion testimony regarding the discrepancies or differences among the accounts of the three co-defendants other than the defendant on trial (Rose). *Id.* at 731-33. The sheriff testified that during his career in law enforcement, he had taken "[h]undreds" of statements from co-defendants in cases involving multiple perpetrators. *Id.* at 731. The sheriff opined that it was "not unusual" "for there to be minor differences or discrepancies in the stories of co-defendants." *Id.* at 731-32. The sheriff also opined that "it would be unusual" if there were not such discrepancies. *Id.* at 732. Finally, the sheriff testified that the statements he obtained from Rose's three co-defendants were all "[c]onsistent" "with what [he] knew about" the rest of the evidence obtained during the investigation. *Id.* The Supreme Court held that the sheriff's opinion was improper because "[h]e, in essence, told the jury that they were to believe the stories of the three co-defendants, despite discrepancies among their accounts of [the crime]." *Id.* at 733. The Court reasoned that the sheriff's testimony was "unacceptable" for "two reasons": it was "more prejudicial than probative," and it was not based on the sheriff's personal knowledge. *Id.* It amounted to nothing more than the sheriff's "opinion that the prosecution's witnesses were telling the truth when they implicated . . . Rose." *Id.* The Court held that Rose was entitled to a new trial based on the cumulative effect of this error and the improper admission of evidence of prior offenses by Rose. *Id.*

¶69.    We conclude that *Rose* is distinguishable. Unlike *Rose*, the prosecutor did not ask Dikes to give opinion testimony regarding "usual" or "unusual" characteristics of a victim's statement. Rather, as discussed above, Dikes gave brief testimony about what the evidence

26

in this case indicated. Further, Dikes's testimony was in response to Piccaluga's own questions about the possibility that Vickie and Tina were "lying." For the reasons discussed above in section II.D, we conclude that Piccaluga invited Dikes's brief testimony.

**CONCLUSION**

¶70. The trial judge did not err by denying Piccaluga's motion to suppress because Piccaluga did not invoke his right to counsel or to remain silent under *Miranda*. There was no "prosecutorial misconduct" during the trial. Finally, the trial judge did not abuse her discretion by allowing the jurors to use a transcript while the recorded phone call was played or by overruling Piccaluga's objection during the redirection examination of Investigator Dikes. Because Piccaluga fails to identify any reversible error, his convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**